SEA VIEW ESTATES BEACH CLUB, INC., Petitioner-
Appellant,†

v.

STATE OF WISCONSIN DEPARTMENT OF NATURAL
RESOURCES, Respondent-Respondent,

Michael and Lauren ZIMMERLY, Intervenors-
Respondents-Respondents.

Court of Appeals

*No. 97–3418. Submitted on briefs August 24, 1998.—Decided
November 18, 1998.*

(Also reported in 588 N.W.2d 667.)

†Petition to review denied.

140

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Patrick J. Hudec* of *Hudec Law Offices, S.C.* of East Troy.

On behalf of the respondent-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Joanne F. Kloppenburg*, assistant attorney general.

On behalf of the intervenors-respondents-respondents, the cause was submitted on the brief of *Jeffrey P. Clark* and *Colleen D. Ball* of *Reinhart, Boerner, Van Deuren, Norris & Rieselbach, S.C.*, of Milwaukee.

Before Snyder, P.J., Brown and Nettesheim, JJ.

SNYDER, P.J.   This is an appeal from an order affirming a Department of Natural Resources (DNR) decision granting a permit for a 110-foot pier with twelve boat slips to Sea View Estates Beach Club, Inc. (Sea View). Sea View contends that the circuit court erred by failing to defer to the DNR's initial recommendation for a 190-foot pier permit with twenty-four boat slips. Additionally, Sea View argues that it does not need a pier permit and disputes findings that the 190-foot pier would violate the rights of other riparian own-

ers, the Waukesha county "anti-pyramiding" ordinance and the public interest. We are not persuaded by these arguments; therefore, we affirm.

## BACKGROUND

Sea View consists of residential property owners who collectively own sixty feet of lakefront on Pewaukee Lake. In 1994 Michael and Lauren Zimmerly, owners of a lakefront home next to Sea View's property and existing pier, complained that the pier was too long and disruptive. At the time, Sea View operated and maintained a 215-foot pier without a permit.[1] In response to the Zimmerlys' concerns, DNR water management specialist Marty Johnson conducted a site inspection of the Sea View pier on June 28, 1994, and reported his findings to the DNR's Bureau Director for Water Regulation and Zoning. Johnson's report noted several concerns about the pier length, including its effect on swimmers and boat traffic and its impact on lakeshore aesthetics. Despite these concerns, Johnson recommended that the DNR issue a permit for a 190-foot pier with twenty-four boat slips.

On June 5, 1995, Sea View applied for the permit recommended by Johnson.[2] The Zimmerlys and three other parties objected and Administrative Law Judge Jeffrey Boldt (ALJ), a hearing officer for the Division of Hearings and Appeals (DHA), conducted a § 227.43(1)(b), STATS., contested hearing on June 27 and July 12, 1996. After hearing testimony from sev-

---

[1] Sea View's pier dates from 1959. The pier's length has varied over the years from 70 feet in 1970 to 215 feet in 1994.

[2] Although Sea View initially requested a 195-foot pier with twenty-five boat slips, it now proposes that we follow Johnson's recommendation of a 190-foot pier with twenty-four slips.

eral DNR experts, including Johnson, and others both in support of and in opposition to Sea View's proposed pier, the ALJ found that the proposed 190-foot pier would violate: (1) the line of navigation pursuant to WIS. ADM. CODE §§ NR 326.04(1) and 326.03(3); (2) the public interest under § 30.12(2), STATS.; (3) "the rights of other riparian owners" within § NR 326.04(6); and (4) Waukesha county's anti-pyramiding ordinance. The ALJ concluded that a pier permit limited to 110 feet and no more than twelve boat slips should be issued.

In spite of Johnson's initial recommendation for a 190-foot pier, the DNR adopted the ALJ's decision as its own and Sea View then appealed to the Waukesha county circuit court.[3] On September 23, 1997, the court affirmed the decision limiting Sea View's pier as recommended by the ALJ. Sea View appeals from that order.

### STANDARD OF REVIEW

■

Sea View initially contends that the circuit court erred in reviewing and giving deference to the ALJ's decision, which it characterizes as a DHA decision, rather than to Johnson's recommendation, which it maintains is a DNR decision. In an appeal from a circuit court order affirming an agency decision, we review the agency's decision, not the circuit court's. *See Sterlingworth Condominium Ass'n v. DNR,* 205 Wis. 2d 710, 720, 556 N.W.2d 791, 794 (Ct. App. 1996). Relying upon *Roehl Transport, Inc. v. Wisconsin Division of Hearings & Appeals,* 213 Wis. 2d 452, 570 N.W.2d 864 (Ct. App. 1997), Sea View argues that deference should

---

[3] *See* §§ 227.52, 227.53, STATS. The Zimmerlys were permitted to intervene in the judicial review proceeding under § 227.53(1)(d) and (2).

be given to Johnson's initial DNR recommendation rather than to the ALJ's later DHA decision. Conversely, the DNR and the Zimmerlys contend that the ALJ's decision should be accorded deference because the DNR adopted it as its final agency decision pursuant to § 227.46(3), STATS. We agree with the DNR and the Zimmerlys.

In *Roehl*, we addressed the standard of review applicable to a DHA-assigned ALJ decision involving the assessment of state fuel taxes on an interstate trucking firm. *See Roehl*, 213 Wis. 2d at 455, 570 N.W.2d at 866. We reviewed the different levels of agency deference and noted that the greater the experience and expertise of the agency in the area at issue, the greater the deference the agency should be afforded. *See id.* at 458–60, 570 N.W.2d at 867–68. In *Roehl*, we concluded that the DHA had not developed the experience, expertise or specialized knowledge in the area of fuel or excise taxation possessed by the Department of Transportation (DOT) or the Tax Appeals Commission. *See id.* at 460–61, 570 N.W.2d at 868. We pointed out that the DHA is unlike a "line" agency because it operates under the province of the Department of Administration, *see* § 15.103, STATS., whose purpose is to provide management services and assistance to other state agencies and departments, *see* § 16.001, STATS. *See Roehl*, 213 Wis. 2d at 460, 570 N.W.2d at 868. Accordingly, we held that the DHA determination should be accorded no deference at all.

Although in many ways *Roehl* is analogous to the instant case, it is not controlling because, unlike the DOT in *Roehl*, the DNR has expressly adopted the ALJ decision here. Section 227.43(1), STATS., provides that the DHA administrator is authorized to "[a]ssign a

hearing examiner to preside over any hearing of a contested case" in matters before certain state agencies, including both the DOT and the DNR. *See* § 227.43(1)(b), (br); *Roehl,* 213 Wis. 2d at 455 n.1, 570 N.W.2d at 866. Once the DHA hearing examiner has made a final determination, the agency is provided three options with respect to the contested case. The agency "*may by rule* or in a particular case may by order":

> (a) *Direct that the hearing examiner's decision be the final decision of the agency;*
> (b) [D]irect that the record be certified to it without an intervening proposed decision; or
> (c) Direct that the procedure in sub. (2) be followed, except that in a class 1 proceeding both written and oral argument may be limited.

Section 227.46(3), STATS. (emphasis added).

The DNR has promulgated the following rule pursuant to § 227.46(3)(a), STATS.:

> Unless the department petitions for judicial review as provided in s. 227.46 (8), Stats., *the decision* [of the DHA hearing officer] *shall be the final decision of the department,* but may be reviewed in the manner described in s. NR 2.20.

WISCONSIN ADM. CODE § NR 2.155(1) (emphasis added); *see Town of Two Rivers v. DNR,* 105 Wis. 2d 721, 737, 315 N.W.2d 377, 384–85 (Ct. App. 1981), *overruled on other grounds by Milwaukee Metro. Sewerage Dist. v. DNR,* 126 Wis. 2d 63, 375 N.W.2d 648 (1985). *Roehl* is distinguishable because the DOT has no such rule. Here, the DNR chose not to seek review of the DHA hearing examiner's decision, thereby making the ALJ decision its own under its own rule.

We now turn to the level of deference accorded to an ALJ decision adopted by the DNR. A different standard of review for agency decisions is applied for questions of law and questions of fact. *See Knight v. LIRC,* 220 Wis. 2d 137, 147, 582 N.W.2d 448, 453 (Ct. App.), *review denied,* 220 Wis. 2d 365, 585 N.W.2d 157 (1998). If presented with a question of fact, we employ the "substantial evidence" standard. *See* § 227.57(6), STATS. Substantial evidence is such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. *See Sterlingworth,* 205 Wis. 2d at 727, 556 N.W.2d at 797. An agency's decision may be set aside by a reviewing court only when, upon examination of the entire record, the evidence, including the inferences therefrom, is such that a reasonable person could not have reached the decision from the evidence and its inferences. *See id.*

If the issue presents a question of law, we must "set aside or modify the agency action if [we] find[ ] that the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action, or [we] shall remand the case to the agency for further action under a correct interpretation of the provision of law." Section 227.57(5), STATS. To this end, we apply one of three levels of deference to the conclusion of the agency: "great weight," "due weight" or "de novo." *See Knight,* 220 Wis. 2d at 147, 582 N.W.2d at 453; *Harnischfeger Corp. v. LIRC,* 196 Wis. 2d 650, 659–60, 539 N.W.2d 98, 102 (1995).

The great weight standard is the highest degree of deference. It is applied when the agency is charged with administration of the statute at issue, the

agency's interpretation is based on "its expertise or specialized knowledge," the interpretation provides "uniformity and consistency in the application of the statute," and the agency conclusion or interpretation is "long standing." *See Roehl*, 213 Wis. 2d at 458–59, 570 N.W.2d at 867 (quoting *Harnischfeger*, 196 Wis. 2d at 660, 539 N.W.2d at 102). If the foregoing criteria are met, we will sustain the agency's interpretation even if an equally or more reasonable interpretation is offered. *See id.* at 459, 570 N.W.2d at 868.

■ Although Sea View disputes what constitutes the DNR's final decision, all of the parties agree that the DNR's decision should be granted great weight deference. We agree. The legislature has charged the DNR with the duty of enforcing environmental laws, *see Barnes v. DNR*, 178 Wis. 2d 290, 304, 506 N.W.2d 155, 161 (Ct. App. 1993), *aff'd*, 184 Wis. 2d 645, 516 N.W.2d 730 (1994), including the regulation of piers in navigable waters pursuant to §§ 30.12 and 30.13, STATS. The DNR has technical expertise in environmental matters, *see State ex rel. Boehm v. DNR*, 174 Wis. 2d 657, 677, 497 N.W.2d 445, 454 (1993), which includes the regulation of piers and waterways. Despite Sea View's urging, however, we decline to defer to the DNR expertise found in Johnson's preliminary recommendation because the DNR has expressly adopted the ALJ decision under WIS. ADM. CODE § NR 2.155(1). Therefore, we conclude that the DNR's final decision—adopting the ALJ determination—is entitled to great weight.

## DISCUSSION

Before we address Sea View's remaining points of error, we find it instructive first to lay out the statutory framework for determining when a pier permit is

149

required and what conditions must be met to obtain a permit. Generally speaking, a riparian owner may install a pier[4] in navigable water with or without a permit. A permit is required if the owner seeks "[t]o deposit any material or to place any structure upon the bed of any navigable water." Section 30.12(1), STATS.[5] The DNR may issue a permit to a riparian owner who wishes "to build or maintain" a pier if the structure "does not materially obstruct navigation" and "is not detrimental to the public interest." Section 30.12(2).[6]

DNR regulations require that a pier permit be obtained pursuant to § 30.12, STATS., when riparians intending to construct piers do not conform to § NR 326.04(1). *See* WIS. ADM. CODE § NR 326.05. WISCONSIN

---

[4] "Pier" has been defined as "any structure extending channelward from the shore with water on both sides, built or maintained for the purpose of providing a berthing or mooring place for watercraft or for loading or unloading cargo or passengers onto or from watercraft." WISCONSIN ADM. CODE § NR 326.03 (7).

[5] Section 30.12(1), STATS., states:

[U]nless a permit has been granted by the department pursuant to statute or the legislature has otherwise authorized structures or deposits in navigable waters, it is unlawful:

    (a) To deposit any material or to place any structure upon the bed of any navigable water where no bulkhead line has been established; or

    (b) To deposit any material or to place any structure upon the bed of any navigable water beyond a lawfully established bulkhead line.

[6] Section 30.12(2), STATS., provides in pertinent part:

The [DNR] . . . may grant to any riparian owner a permit to build or maintain for the owner's use a structure otherwise prohibited under sub. (1), if the structure does not materially obstruct navigation or reduce the effective flood flow capacity of a stream and is not detrimental to the public interest.

ADM. CODE § NR 326.04(1) states that a constructed pier "shall not extend into the water from the shoreline beyond the line of navigation" or pierhead line.[7] If the pier extends beyond the line of navigation[8] or pierhead line,[9] a riparian owner must obtain a permit under § 30.12.

Apart from the § 30.12, STATS., permit requirements, a riparian owner may place a pier in navigable water without a permit if certain conditions are satisfied. These conditions include the following:

> (a) The wharf or pier does not interfere with public rights in navigable waters.

---

[7] WISCONSIN ADM. CODE § NR 326.04(1) lists a number of "pier standards" which include:

(1) Except as provided in sub. (2) or (8), piers shall not extend into the water from the shoreline beyond the line of navigation or the length of the boat using the pier unless a need can be demonstrated by the riparian that boats using the pier require a greater depth of water. The depth of water necessary for nonfixed keel sailboats shall be measured with the centerboard or dagger boards raised.

(2) Piers may extend out to any pierhead line.

. . . .

(5) Piers shall not unreasonably obstruct navigation or otherwise interfere with public rights in navigable waters.

(6) Piers shall not interfere with the rights of other riparians.

[8] "Line of navigation" refers to "the 3 foot depth contour or a greater depth contour if required for boats in use or appropriate for use on the waterway, based on the normal summertime low levels on the waterway or summer minimum levels where established by department order." WISCONSIN ADM. CODE § NR 326.03(3).

[9] "Pierhead line" is described as "a line established in the water adjacent to and roughly parallel to the shoreline under s. 30.13, Stats., by municipalities, and subject to approval by the department, for the purpose of creating uniformity in the length of piers extending from the shoreline into the waterway." WISCONSIN ADM. CODE § NR 326.03(8).

(b)   The wharf or pier does not interfere with rights of other riparian proprietors.

(c)   The wharf or pier does not extend beyond any pierhead line which is established under sub. (3).

(d)   The wharf or pier does not violate any ordinances enacted under sub. (2).

(e)   The wharf or pier is constructed to allow the free movement of water underneath and in a manner which will not cause the formation of land upon the bed of the waterway.

Section 30.13(1), STATS.

Sea View claims that its proposed pier does not require a permit because all of the conditions of § 30.13(1), STATS., have been met. Alternatively, Sea View argues that its proposed pier does not obstruct navigation and is not detrimental to the public interest within the meaning of § 30.12, STATS., and therefore a permit should be granted for its proposed 190-foot structure.

A.   Permit Exemption

Without specifically addressing the exemption criteria under § 30.13(1), STATS., the ALJ concluded that Sea View must obtain a pier permit. The ALJ made its determination based upon the line of navigation requirement found in WIS. ADM. CODE §§ NR 326.05 and 326.04(1). For Sea View's pier, the line of navigation—the three-foot water depth contour necessary for boat use—extended sixty to sixty-eight feet from the shore. However, the water depth at the end of Sea View's proposed pier was four and one-half to five feet. Based on these figures, the ALJ determined that a permit was necessary for any pier extending beyond sixty-eight feet from the shore.

Sea View does not dispute these findings. However, it contends that its proposed pier is nonetheless exempt from permitting under § 30.13(1), STATS. We disagree. The permitting criteria under WIS. ADM. CODE § NR 326.05 are intended to supplement the criteria found within § 30.13(1).[10] In order for Sea View to escape the permitting process, it must satisfy both the requirements under § 30.13(1) and the corresponding regulations under § NR 326.05. Here, Sea View's proposed pier violates § NR 326.05 because it extends beyond the line of navigation. Consequently, Sea View is not exempt from a pier permit.

## B. Permit Requirements

Pursuant to § 30.12(2), STATS., the DNR may issue a pier permit if the structure does not offend the public interest.[11] In addition, WIS. ADM. CODE § NR 326.04 provides that a pier shall not interfere with public rights in navigable waters or the rights of other riparians. Based upon these standards, the ALJ concluded that Sea View's proposed pier would: (1) interfere with the public interest,[12] (2) interfere with the rights of

[10] WISCONSIN ADM. CODE § NR 326.01(1) states that the rules set forth in ch. 326 "are promulgated under ss. 30.03, 30.12, 30.13, 30.14, 30.15 and 227.11, Stats., in order to provide consistency in the application of ss. 30.12 and 30.13, Stats., to the construction of piers, boat shelters and similar structures on the beds of navigable waterways as aids to navigation."

[11] The other requirement under § 30.12(2), STATS.—that the pier "not materially obstruct navigation or reduce the effective flood flow capacity of a stream"—was not contested by the parties.

[12] For the sake of clarity, we interpret "the public interest" and "the public rights in navigable waters" to be synonymous as both terms derive from the public trust doctrine. *See Hixon v.*

other riparian owners, and (3) violate Waukesha county's anti-pyramiding ordinance. We address each point in turn.

## 1. *Public Interest*

Sea View argues that there is no evidentiary support for the ALJ's determination that the proposed pier is detrimental to the public interest. Sea View points to expert testimony from the DNR presented at the contested hearing which allegedly indicates that Sea View's proposed pier would not have an adverse impact on public rights. We are not persuaded by Sea View's argument.

In its interpretation of the public interest, the ALJ looked to the DNR's "reasonable use" doctrine, which is a nonbinding policy found in an informal DNR program guide. The "reasonable use" guidelines state as a general rule that a pier may hold two boat spaces for the first fifty or fewer feet of shoreline and that an additional space is granted for each additional fifty feet of shoreline. In creating this standard, the DNR reviewed the common law "reasonable use" doctrine, which provides:

---

*Public Serv. Comm'n*, 32 Wis. 2d 608, 618–20, 146 N.W.2d 577, 582 (1966) ("While the state of Wisconsin holds the beds of navigable waters in trust for all its citizens, the legislature may authorize limited encroachments upon the beds of such waters where the public interest will be served."); *Village of Menomonee Falls v. DNR*, 140 Wis. 2d 579, 589 n.5, 412 N.W.2d 505, 510 (Ct. App. 1987) ("[T]he [public] trust doctrine has been expanded to include public rights in the recreational enjoyment of navigable waters . . . .").

[E]very . . . right which a riparian owner acquires, as such, to the waters . . . by his land, is restricted always to that which is a . . . reasonable use, and these terms are to be measured and determined by the extent and capacity of the [lake], the uses to which it has been put, and the rights that other riparian owners on the same [lake] also have.

*Sterlingworth*, 205 Wis. 2d at 731–32, 556 N.W.2d at 798–99 (holding that the DNR's issuance of a pier permit pursuant to the DNR's "reasonable use" guidelines was not arbitrary and capricious); *Apfelbacher v. State*, 167 Wis. 233, 239, 167 N.W. 244, 245 (1918). Although the "reasonable use" guidelines do not have the force and effect of law, *see Sterlingworth*, 205 Wis. 2d at 732, 556 N.W.2d at 798, we find them indicative of the public interest, *see generally Swanson v. DHSS*, 105 Wis. 2d 78, 88, 312 N.W.2d 833, 838 (Ct. App. 1981) (A court may accord weight to guidelines of an agency depending upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.").

Based upon the "reasonable use" guidelines, the ALJ initially determined that with only sixty feet of shoreline a riparian owner, such as Sea View, would only be allotted two or three boat slips on its pier. However, the ALJ noted that the DNR will not generally hold existing facilities to the same "reasonable use" standard as it would apply to new proposals. The ALJ then found that: (1) Sea View's pier was never validly permitted; (2) Sea View never moored as many as twenty-five boats (the number it requested); and (3) the proposed pier would be "fundamentally unfair to riparians who have obtained the required permit to allow greater privileges to an unpermitted facility, however

155

long it has been placed in public waters." Based on these considerations, the ALJ concluded that a smaller 110-foot pier was appropriate, even though Sea View "will continue to place the largest pier in the area on the smallest riparian tract."

We are convinced that the ALJ's findings are supported by substantial evidence in the record. *See* § 227.57(6), STATS. First, the record clearly shows that Sea View never obtained a permit. Second, there is no evidence to indicate that Sea View ever moored twenty-five boats. Historically, only ten to fifteen boats had been docked on Sea View's pier; the number has increased to approximately twenty since 1984. Third, the record reveals, and Sea View does not dispute, that Sea View's relatively small shorefront property is disproportionate to the length of its proposed and existing pier. We conclude that the ALJ properly relied upon these findings in concluding that a 110-foot pier was appropriate.

## 2. *Rights of Other Riparian Owners*

In addressing the rights of neighboring riparians, the ALJ indicated that it sought to balance "the rights of the public with the rights of the private riparians." The ALJ then examined the testimony of the Zimmerlys as well as other neighbors of the Sea View pier. The ALJ found that the high number of boats mooring in Sea View's small riparian zone has led to safety hazards for the neighbors. The ALJ concluded that Sea View's boats have intruded into the Zimmerlys' riparian zone, "including specifically areas behind the line of navigation which the common law requires be made available to a riparian."

Sea View charges that the ALJ's method of "balancing" the rights of competing riparians was improper

because it is contrary to DNR policy and practice and is not provided for by § 30.13(1), STATS., or the administrative code. We disagree and hold that the ALJ properly addressed the rights of riparian owners.

■

Riparian rights are defined generally by common law. A riparian owner is accorded certain rights based upon title to the ownership of shorefront property. *See Stoesser v. Shore Drive Partnership*, 172 Wis. 2d 660, 666, 494 N.W.2d 204, 207 (1993). These rights are well defined and include the right to use the shoreline and have access to the waters, the right to reasonable use of the waters for domestic, agricultural and recreational purposes, and the right to construct a pier or similar structures in aid of navigation. *See id.* at 666 n.2, 494 N.W.2d at 207. A riparian owner is entitled to exclusive possession to the extent necessary to reach navigable water and to have "reasonable access for bathing and swimming." *Godfrey Co. v. Lopardo*, 164 Wis. 2d 352, 374, 474 N.W.2d 786, 795 (Ct. App. 1991). A determination of exclusive possession "*balances* the rights of all lakefront owners and the public to riparian space." *Id.* (emphasis added).

■

Contrary to Sea View's argument, the ALJ appropriately considered a "balancing" of competing riparian rights. As we noted in *Godfrey*, a finding of riparian rights involves a "necessary" balancing of interests. *See id.* Accordingly, we conclude that the ALJ did not err.

■

Next, Sea View contends that the ALJ was obligated to follow WIS. ADM. CODE § NR 326.07(1),[13] which states as a general rule that "all riparian owners

---

[13] WISCONSIN ADM. CODE § NR 326.07(1) provides in full:

should have their due proportion of the line of navigation and a course of access to it exclusive of every other owner." *Borsellino v. Kole,* 168 Wis. 2d 611, 617, 484 N.W.2d 564, 567 (Ct. App. 1992). Section NR 326.07(2) sets forth four "alternative methods of apportionment" of riparian rights, the first of which is based upon the line of navigation. *See* § NR 326.07(2)(a). The line of navigation method measures the entire shoreline of a bay and the line of navigation in front of the shoreline and "apportion[s] the line of navigation among the riparians in proportion to the length of their respective holdings on the shoreline." *Id.*

Although the ALJ did not specifically mention any particular method of apportionment of riparian rights under WIS. ADM. CODE § NR 326.07(2), the ALJ noted that Sea View's boats intruded beyond the Zimmerlys' line of navigation "including specifically areas behind the line of navigation which the common law requires be made available to a riparian." We are satisfied that the ALJ sufficiently addressed the code's line of navigation and course of access concerns.

### 3. *Waukesha County's Anti-Pyramiding Ordinance*

The ALJ determined that Sea View's proposed pier violated the "letter and spirit" of Waukesha county's anti-pyramiding ordinance (ordinance). On appeal, Sea

---

In order to determine whether a pier or boat shelter interferes with the rights of an adjacent riparian, the [DNR] shall use the method outlined in this subsection which it determines most fully meets the Wisconsin supreme court ruling in *Rondesvedt v. Running,* 19 Wis. 2d 614 (1962), that "... each must have his due proportion of the line bounding navigability and a course of access to it from the shore exclusive of every other owner, and that all rules for apportionment or division are subject to such modification as may be necessary to accomplish substantially this result."

View now argues that the ordinance does not apply in this case because it is not an appropriate criterion under § 30.12(1), STATS., and because a pier permit proceeding is not an appropriate forum for determining alleged zoning violations. Alternatively, Sea View contends that the ordinance is inapplicable because its pier predates the enactment of the 1970 ordinance. We are not persuaded by either of these arguments.

The ALJ applied the ordinance because it reflected "the public interest in navigable waters as adopted by the citizens of the County through their elected public officials." The ALJ noted that "[s]ince 1970, the County has sought to limit exactly the type of development reflected at the site, namely residents of a backlot subdivision owning a small riparian strip and then seeking riparian rights reflecting the size of the subdivision more than the size of the riparian tract they own." The ALJ then concluded that enforcement of the ordinance would be consistent with the purpose of the public trust doctrine which is to preserve and protect public waters.

Although the standards for issuing a permit under § 30.12(2), STATS., do not specifically include compliance with local zoning ordinances, we are not convinced that the DNR or an ALJ may not review local ordinances in making permit determinations pursuant to § 30.12(2). Rather, we hold that the ALJ properly considered the ordinance in an effort to establish the public interests at stake. In *Sterlingworth*, we noted that the policy factors demonstrating the public interest included "the desire to preserve the natural beauty of our navigable waters, to obtain the fullest public use of such waters, including but not limited to navigation, and to provide for the convenience of riparian owners." *Sterlingworth*, 205 Wis. 2d at 724–25, 556 N.W.2d at

796 (quoting *Hixon v. Public Serv. Comm'n*, 32 Wis. 2d 608, 620, 146 N.W.2d 577, 583 (1966)). As suggested by the ALJ, such public interest concerns mirror the purposes of the ordinance, which include: (1) maintaining the safe and healthful conditions of the water, (2) protecting spawning grounds and aquatic life, (3) controlling the placement of structures and land uses, (4) preserving shore cover and natural beauty, and (5) promoting the general attractiveness and character of the community environment. *See* WAUKESHA COUNTY, WIS., SHORELAND & FLOODLAND PROTECTION ORDINANCE § 1.02 (1995) (hereinafter ORDINANCE). Thus, we conclude that the ALJ appropriately considered the ordinance in its determination of the public interest.

Sea View next argues that a pier permit proceeding is not the appropriate place for addressing a zoning violation. We are not persuaded. Section 30.13(1)(d), STATS., includes compliance with municipal ordinances regulating piers as a criterion for pier permit exemption. We fail to see why a local zoning ordinance may be considered for the purpose of determining permit exemption but not for determining whether a permit should be issued under § 30.12(2), STATS.

Sea View further contends that if the ordinance is relevant to its case, the ordinance should not apply because Sea View's pier, first constructed in 1959, predates the enactment of the 1970 ordinance. Sea View's use of the lakefront, it claims, is now a legal nonconforming use. Responding to this contention, the ALJ noted that while Sea View's use of its pier in 1970 may have been a legal nonconforming use, the ordinance barred its use from becoming "expanded or enlarged." *See* ORDINANCE § 3.15(2)(B)1. The ALJ found that the number of boat slips on the pier increased incrementally from twelve in 1975 to fifteen in 1978. Based

on these figures, the ALJ determined that the "residents have dramatically increased their demands on public waters in terms of the numbers of boats occupying space on public waters since the enactment of the Ordinance." The ALJ then concluded that Sea View's existing and proposed pier violated the ordinance.

Sea View disputes the ALJ's finding that it increased the number of boat slips on its pier. The ALJ's determination, however, is supported by substantial evidence. At the contested hearing, photographs were presented depicting an increase in the size of the pier from 1970 to 1980. In addition, Sea View's own records reveal the gradual increase of boat slips from twelve in 1975 to an estimated twenty-three in 1996. Accordingly, we conclude that the ALJ properly determined that Sea View's existing and proposed pier violated the ordinance.[14]

## C. Arbitrary and Capricious

Next, Sea View claims that the ALJ's decision to permit a 110-foot pier was not supported by substantial evidence in the record and is thus arbitrary and capricious. In particular, Sea View contends that the ALJ's determinations are contrary to undisputed evidence

---

[14] Sea View additionally argues that the ordinance does not apply because Sea View's pier is not an "accessory building" as defined under WAUKESHA COUNTY, WIS., SHORELAND & FLOODLAND PROTECTION ORDINANCE § 2.02(8) (1995). However, we deem Sea View's argument waived because it was not raised at the contested hearing before the ALJ. *See Omernick v. DNR*, 100 Wis. 2d 234, 248, 301 N.W.2d 437, 444 (1981) ("[P]arties to an administrative proceeding must raise known issues and objections and . . . all efforts should be directed toward developing a record that is as complete as possible in order to facilitate subsequent judicial review of the record under [ch. 227, STATS.].").

presented by the DNR at the contested hearing. We disagree. As we have stated earlier, because the DNR adopted the ALJ's decision, we give deference to the findings of the ALJ, not to the preliminary findings and recommendation of the DNR. Since we have already examined Sea View's specific points of error relating to the question of substantial evidence, we will not revisit them here.

### D.  Judicial Estoppel

Lastly, Sea View states that during the contested hearing the DNR supported its own recommendation of a 190-foot pier with twenty-four boat slips but then reversed itself when it joined the attorney general in advocating the ALJ's position of a 110-foot pier with twelve boat slips. Sea View contends that the doctrine of judicial estoppel should preclude the DNR from supporting a position on appeal that is contrary to the position it took before the ALJ. Sea View's argument is without merit.

■■■ The doctrine of judicial estoppel generally bars a party from taking a position in a legal proceeding that is inconsistent with a previous position. *See Davis v. American Family Mut. Ins. Co.*, 212 Wis. 2d 382, 390, 569 N.W.2d 64, 67 (Ct. App.), *review denied*, 212 Wis. 2d 690, 569 N.W.2d 591 (1997). The trial court has the prerogative to invoke judicial estoppel at its discretion because estoppel "is not directed to the relationship between the parties, but is intended to protect the judiciary as an institution from the perversion of judicial machinery." *State v. Petty*, 201 Wis. 2d 337, 346–47, 548 N.W.2d 817, 820 (1996) (quoted source omitted). For judicial estoppel to apply, the following criteria must be satisfied: "First, the later position must be

clearly inconsistent with the earlier position; second, the facts at issue should be the same in both cases; and finally, the party to be estopped must have convinced the first court to adopt its position—a litigant is not forever bound to a losing argument." *Id.* at 348, 548 N.W.2d at 821.

Judicial estoppel does not apply in this case because Sea View fails to demonstrate that all the elements have been met. In particular, the party to be estopped—the DNR as represented by the attorney general—did not convince the first court—the ALJ—to adopt its position. To the contrary, the DNR was unable to persuade the ALJ to follow the DNR's preliminary recommendation of a 190-foot pier. The DNR is not now bound by its losing *preliminary* position.

This is also not a situation involving "the perversion of judicial machinery" or the "cold manipulation" of justice. *See id.* at 346–47, 548 N.W.2d at 820. Chapter 227, Stats., is designed to allow an agency to make an initial recommendation and after a contested hearing direct the ALJ's ruling to be the final decision of the agency. In the instant case, the DNR adopted the findings and conclusion of the ALJ. We therefore conclude that Sea View's judicial estoppel argument is without support and affirm the decision limiting Sea View to a permit for a 110-foot pier with twelve boat slips.

*By the Court.*—Order affirmed.